AO93 Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>Heber Herman Samm (YOB: 1990). | Case No.  25-04206MB |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

**As further described in Attachment A.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

**As set forth in Attachment B.**

**YOU ARE COMMANDED** to execute this warrant on or before _____June 15, 2025_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to any United States Magistrate Judge on criminal duty in the District of Arizona.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

*Camille D. Bibles*
Digitally signed by Camille D. Bibles
Date: 2025.06.02 13:25:25 -07'00'

Date and time issued: _____

*Judge's signature*

City and state: <u>Flagstaff, Arizona</u>

<u>Honorable Camille D. Bibles, U.S. Magistrate Judge</u>
*Printed name and title*

## ATTACHMENT A

### Person to Be Searched

HEBER HERMAN SAMM, a Native American male, year of birth 1990. The image below is a photograph of HEBER that was taken on April 22, 2025, at the time of his arrest. HEBER is currently incarcerated at the Corecivic Correctional Facility in Florence, Arizona.



## ATTACHMENT B

### Things To Be Seized

1.      Evidence in the form of deoxyribonucleic acid ("DNA") to be obtained from HEBER HERMAN SAMM through cotton/buccal swabs in the mouth.

2.      Evidence in the form of major case prints to be obtained from HEBER HERMAN SAMM through inking the left and right hands and rolling the hands onto paper for fingerprints and palm prints.

3.      Evidence in the form of a hair sample to be obtained from HEBER HERMAN SAMM's head, arm, or other external areas through plucking hair follicles one at a time with sanitized tweezers—up to but not exceeding 25.

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>Heber Herman Samm (YOB: 1990). | Case No.  25-04206MB |

## APPLICATION FOR A SEARCH WARRANT

I, Jenifer J. Mulhollen, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1153 & 1111 | CIR-Second Degree Murder |

The application is based on these facts:

**See attached Affidavit of Special Agent Jenifer J. Mulhollen**

☒ Continued on the attached sheet.
☐ Delayed notice of  30  days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA W. Vinnie Lichvar

*W.V.L*

JENIFER MULHOLLEN
Digitally signed by JENIFER MULHOLLEN
Date: 2025.06.02 10:53:34 -07'00'

*Applicant's Signature*

Jenifer J. Mulhollen, FBI Special Agent

*Printed name and title*

Sworn telephonically.

Camille D. Bibles
Digitally signed by Camille D. Bibles
Date: 2025.06.02 13:24:45 -07'00'

*Judge's signature*

Date: _____

City and state: Flagstaff, Arizona

Honorable Camille D. Bibles, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Person to Be Searched

HEBER HERMAN SAMM, a Native American male, year of birth 1990. The image below is a photograph of HEBER that was taken on April 22, 2025, at the time of his arrest. HEBER is currently incarcerated at the Corecivic Correctional Facility in Florence, Arizona.



**ATTACHMENT B**

**Things To Be Seized**

1.       Evidence in the form of deoxyribonucleic acid ("DNA") to be obtained from HEBER HERMAN SAMM through cotton/buccal swabs in the mouth.

2.       Evidence in the form of major case prints to be obtained from HEBER HERMAN SAMM through inking the left and right hands and rolling the hands onto paper for fingerprints and palm prints.

3.       Evidence in the form of a hair sample to be obtained from HEBER HERMAN SAMM's head, arm, or other external areas through plucking hair follicles one at a time with sanitized tweezers—up to but not exceeding 25.

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Jenifer J. Mulhollen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.        On May 6, 2025, Heber Samm was indicted by a federal grand jury for one count of Second-Degree Murder. During the initial investigation of the murder, FBI Special Agents collected multiple knives and other items that may have been used to kill and dismember the victim. FBI Special Agents also collected swabs of red substances and hair samples from the residence and surrounding area where the victim's body was found. Following an autopsy of the victim, the medical examiner extracted fingernail clippings from the victim, as well as strands of hair found on the victim's body. This evidence will be sent to the FBI laboratory for examination and comparison. For these reasons, this search warrant seeks a deoxyribonucleic acid ("DNA") standard, hair sample, and major case prints from Heber Samm that will be used for comparison purposes with the evidence described above.

2.        I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since February of 2013. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in narcotics investigations, white collar crime, cyber-crime, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics. I am currently assigned to the Flagstaff Resident Agency of the Phoenix Division. As a Special Agent of the FBI, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), that is, I am an officer of the United States who is authorized by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18. In the course of my official duties, I am charged with the investigation of crimes occurring on the Navajo Nation Indian Reservation ("Navajo Nation") within the District of Arizona. Based on my training, education, and experience, I know that the Navajo Nation is a federally recognized tribe.

3.        The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set

1

forth all of my knowledge about this matter.

4.      Based on the facts set forth in this Affidavit, there is probable cause to believe that a violation of 18 U.S.C. §§ 1153 and 1111, Second Degree Murder, has occurred. Accordingly, there is also probable cause to seize the information described in Attachment A to gather evidence of this crime as further described in Attachment B.

### PROBABLE CAUSE

5.      On April 17, 2025, at approximately 5:06 p.m., Lena Singer called the Navajo Nation Dilkon Police dispatch and stated that she had not heard from her son, C.S., in approximately two weeks. Lena told the dispatcher that C.S. and her nephew, Heber Samm, were staying at her residence in Indian Wells, Arizona, within the confines of the Navajo Nation Indian Reservation.

6.      Later that same day, a Navajo Nation Dilkon Police Officer responded to Lena's residence and met with Lena's sister, Nelly Long. Nelly was with Archie Russell and Wesley Singer. Nelly told the tribal officer that Lena had requested that she conduct a welfare check on C.S. Nelly stated that when she arrived with Archie and Wesley, no one answered the door. However, she stated that when Archie tried climbing through a window, a male inside the residence—not C.S.—waived him away.

7.      The tribal officer approached the home and announced his presence, but no one responded. The tribal officer then contacted Lena and obtained consent to enter the home. After obtaining consent, the tribal officer used several tools to pry the front door open. The tribal officer noticed that there was a chair pinned against the door with a block of wood being used as an anchor to the chair. At that time, a second tribal officer responded to the residence to assist. Both tribal officers then entered the home and found Heber in the bathroom. Heber refused to comply with the officers' commands and became aggressive. He struck one of the officers in the face with his fist and resisted arrest. Heber was ultimately placed in handcuffs and removed from the home. He was charged by the Navajo Nation with Battery Upon a Peace Officer.

8.      The tribal officers noted that there was no sign of C.S. in the home.

9.      The following day, on April 18, 2025, Nelly and her family members returned to Lena's residence to conduct a welfare check on C.S. One of the family members noticed that a dog was digging the ground at the rear of the residence. The family member investigated the area and discovered a chest freezer buried in the ground. The family member partially opened the lid to the freezer and saw a human foot fell out. Nelly and her family members reported their findings to the Navajo Nation Dilkon Police Department.

10.      Tribal officers responded to Lena's residence and confirmed discovery of the freezer. The freezer was buried in a hole that was approximately 3-4 feet deep. The top of the freezer was level with the ground. The Navajo Nation Dilkon Police Department alerted the FBI, who secured the scene until such time that a search warrant could be obtained and executed.

11.      On April 19, 2025, the FBI's Evidence Response Team (ERT) executed a search warrant at Lena's residence and surrounding property. The FBI ERT removed a deceased human body from the freezer. The body had been dismembered and severely mutilated. Among other mutilations, the body had been cut in half below the rib cage. The eyes were missing. There were numerous apparent stab wounds all over the body.

12.      The FBI ERT recovered two cell phones: a blue "Unnecto" cell phone and a white in color "BLU" cell phone, a burned area rug from a burn-pit located on backside of the residence. A shovel was located near the burn-pit with what appeared to be human hair on the handle.

13.      The FBI ERT observed a red substance that appeared to be blood splattered on the living room wall and on the ceiling inside Lena's home. The FBI ERT swabbed the red substance. The FBI ERT also located what appeared to be human hair mixed in with the red substance on the wall. The FBI ERT collected multiple knives, handsaws, and a heavy metal object with a connected pipe on it that resembled an anvil from inside the home. The heavy metal object had a red substance on it that appeared to be blood.

14.      The evidence collected by the FBI ERT, including the swabs of the red substances, the knives and handsaws, and the human hair, will be sent to the FBI Laboratory for analysis and comparison.

15.     The mutilated body was transported to a medical examiner for an autopsy. The medical examiner positively identified the body as belonging to C.S. via fingerprint analysis. The medical examiner's preliminary findings note that C.S. had approximately 49 defects to his body, which included approximately fifteen stab wounds to his backside—three of which penetrated his chest cavity resulting in a collapsed lung. Given the extent of the injuries, the medical examiner noted that C.S.'s head had been nearly severed from the body. She stated that the same was true of one of C.S.'s ankles. The medical examiner also noted that C.S.'s skull had been crushed. The medical examiner indicated that the dismemberment had likely occurred post-mortem. The medical examiner determined that the manner of death was homicide.

16.     The medical examiner obtained nail clippings from C.S., and human hair found on his body. Those items were transferred to the FBI and will be sent to the FBI Laboratory for analysis and comparison.

17.     On April 18, 2025, an FBI Special Agent interviewed Nelly Long. Nelly stated that she is Lena's older sister. Nelly stated that she normally spoke with C.S. every day. She stated that the calls between them stopped approximately two weeks prior to the interview. Nelly stated that her older brother told her that he saw smoke coming from behind Lena's residence on April 17, 2025. She stated that when she went to the house that day, she saw smoke coming from the ground and dug up a rug. She stated that the rug appeared to have blood on it, and it appeared to have been taken out from Lena's home.

18.     On April 18, 2025, an FBI Special Agent interviewed Wesley Singer, who is C.S.'s biological son. Wesley stated that he had spoken with C.S. in February of 2025, while C.S. was intoxicated. During that conversation, C.S. told him that Heber wanted to kill him, but was unsuccessful. C.S. told him that he had kicked Heber out of the house. C.S. told him that Heber had come after him with an axe.

19.     On April 18, 2025, an FBI Special Agent interviewed a pastor from a local church in Indian Wells. During the interview, the pastor stated that on April 1, 2025, he gave C.S. a ride to an auto parts store in Holbrook, Arizona—which was the last day he saw him alive.

20.     On April 19, 2025, an FBI Special Agent interviewed Lena. During this interview, Lena stated that she normally spoke with C.S. every day at approximately 8:00 a.m. She stated she had not spoken with C.S. for approximately two weeks and indicated that it may have been more than a month. A cursory review of Lena's cellphone showed a phone call to C.S.'s cellphone several days before the interview. However, the call-log entry demonstrated that the call lasted zero seconds. The cellphone also showed text messages that appear to have been exchanged between Lena and C.S. on March 29, 2025. A written entry in Lena's journal indicated that the last time she spoke with C.S. was at the end of March of 2025. Lena stated that she had given Heber's mother, Tina Samm, $250.00 on April 2, 2025, to send to C.S. via Western Union.

21.     Lena stated that Heber was C.S.'s cousin or cousin-brother. She stated that C.S. told her that Heber had been living with him beginning in or around January of 2025. Lena stated that Heber was schizophrenic. She stated that she had spoken with Tina within the last few days prior to the interview. Tina told her that Heber had seemed out of place recently. Lena stated that Tina cried during their conversation and stated: "I don't know why my son had to do this. I can't believe he could do something like this." Tina told her that she thought Heber "did it" because he always carried a knife or a machete.

22.     On April 19, 2025, an FBI Special Agent interviewed Tina Samm. Tina stated that she sent $250.00 to C.S. via Western Union on April 1st or 2nd, 2025. She stated that she called C.S. a day or two later to ensure that he received the money. She stated that Heber answered C.S.'s phone and told her that C.S. had walked away after an argument between them. Heber told her that he did not know where C.S. went. Tina confirmed that Heber was schizophrenic. She stated that when Heber did not take his medication, he became angry and paranoid. When she was told that Heber had barricaded himself in Lena's home, Tina stated that Heber had done that before at her house. She stated that Heber would carry "weapons," and that she would take them away when she saw him. Tina stated that she did not know if Heber had anything to do with what happened to C.S. She stated that C.S. and Heber usually got along well. She denied making statements to Lena about whether her son could have done anything to Heber.

5

23.     Tina stated that she had not spoken with Heber within the last few days. When asked to see her cellphone, Tina stated that something happened to her cellphone that resulted in messages being deleted. Upon review of her messages, the FBI Special Agent notices that there were messages on the cellphone before March 14, 2025, and after April 8, 2025. It appeared that messages had been deleted between those dates.

24.     Heber Samm was arrested by FBI Special Agents on April 22, 2025.

25.     On May 6, 2025, Heber Samm was indicted by a federal grand jury for one count of Second Degree Murder (CR-25-08067-PCT-DGC).

26.     C.S. and Heber Samm are enrolled members of the Navajo Nation.

## THINGS TO BE SEARCHED

27.     In my training and experience, I know when people commit crimes they often leave behind DNA, fingerprints, and trace evidence that transfer during the commission of the crime.

28.     As such, a DNA standard, hair sample, and major case prints from Heber Samm are needed to compare to evidentiary items collected during this investigation. The FBI Laboratory will perform the necessary forensic comparisons.

29.     Accordingly, I respectfully request that a search warrant be issued authorizing the seizure of DNA, a hair sample, and major case prints from Heber Samm for the reasons stated above. The process of collecting a DNA standard will include the use of buccal swabs. The buccal swabs will be inserted into Heber's mouth to collect saliva and cheek cells. Hair follicles will be collected from areas of Heber's scalp, arm, or other external areas by plucking one hair follicle at a time with sanitized tweezers. The method of collecting major case prints from Heber will include inking the left and right hands and rolling the hands onto paper for fingerprints and palm prints.

## CONCLUSION

30.     Based on the foregoing, there is probable cause to believe Heber Samm committed the offense of CIR-Second Degree Murder, in violation of Title 18, United States Code, Sections 1153 and 1111, and that there is evidence and/or instrumentalities of the crime located in the property to be searched, particularly described in Attachment A, and the evidence to be searched

for and seized is particularly described in Attachments B.

**Pursuant to 28 U.S.C. § 1746(2), I declare that the foregoing is true and correct to the best of my knowledge and belief.**

JENIFER MULHOLLEN
Digitally signed by JENIFER MULHOLLEN
Date: 2025.06.02 10:54:15 -07'00'

Jenifer J. Mulhollen
Special Agent, Federal Bureau of Investigation

Subscribed and sworn telephonically, this __2nd__ day of June, 2025.

Camille D. Bibles
Digitally signed by Camille D. Bibles
Date: 2025.06.02 13:23:39 -07'00'

HONORABLE CAMILLE D. BIBLES
United States Magistrate Judge

7